# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 13 2019, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Alexander L. Hoover
Law Office of Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of A.H. (Minor Child) and<br><br>J.H. (Father) and T.S. (Mother),<br><br>*Appellants-Respondents,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | December 13, 2019<br><br>Court of Appeals Case No. 19A-JT-1245<br><br>Appeal from the Starke Circuit Court<br><br>The Honorable Nancy L. Gettinger, Senior Judge<br><br>Trial Court Cause No. 75C01-1811-JT-22 |

**Mathias, Judge.**

[1] T.S. ("Mother") and J.H. ("Father") appeal the Starke Circuit Court's order involuntarily terminating their parental rights to A.H. ("Child"). Parents argue there was insufficient evidence to support the termination of parental rights ("TPR"). Finding the evidence sufficient as to both parents, we affirm.

[2] We affirm.

## Facts & Procedural History

[3] Child was born to Mother and Father on February 17, 2011. When she was nearly five years old, on December 15, 2015, a methamphetamine lab exploded in the family's apartment in Knox, Indiana, causing the Starke County Department of Child Services ("DCS") to file a petition alleging Child was a Child in Need of Services ("CHINS"). Mother and Father were arrested, and Child underwent medical examination for potential harm from exposure to the lab. Thereafter, she was placed in relative care with her maternal great-grandmother, which was authorized during a detention hearing the same day when the trial court determined out-of-home placement was necessary to protect Child's health and safety. Mother and Father were each charged with six counts: Level 4 felony dealing in methamphetamine; Level 5 felony neglect of a dependent; Level 6 felony possession of chemical reagents or precursors with the intent to manufacture; Level 6 felony possession of methamphetamine; Level 6 felony theft; and Class B misdemeanor possession of marijuana. A no-contact order was also entered at the time between the parents and Child.

[4] DCS Family Case Manager Kara Crippen ("FCM Crippen") was assigned to Child's case. Initial hearing on the CHINS petition was held on January 12, 2016; both parents appeared in custody, they admitted to some but not all allegations in the petition, and Child was adjudicated a CHINS. Parents were ordered to complete services at a disposition hearing on February 2. While in custody, both parents completed a substance use disorder assessment, clinical assessment, and Father participated in fatherhood engagement services. These activities were reported at a May 2016 review hearing before the trial court. Mother began participating in ordered services upon her release from jail in June 2016. A second review hearing was held in August 2016; both parents continued to participate in services. Father was released to a substance abuse treatment program in November 2016, and both parents appeared in person at a December 2016 review and permanency hearing. At that time, it was reported that in November 2016, Father had a positive screen for methamphetamine, and in September 2016, Mother had a positive screen for suboxone. Starke County DCS policy prevented parents from participating in visitations with Child until each returned three clean screens.

[5] FCM Crippen developed concurrent permanency plans: reunification and adoption. Between the December 2016 hearing and the subsequent review hearing in April 2017, Mother started visits with Child and participated in home-based work, but had not yet secured housing and outside employment. Father had also started visits with Child and secured outside employment. While Child's visits with Mother were reportedly going well, visits with Father

were not. Based on recommendations by Child's therapist at the time, regular visits with Father were slowed. FCM Crippen explained:

> [W]e went down to a therapeutic level visitation. We didn't want to vilify dad. And [Child] was very mad at dad. [Child] blamed dad for the whole situation. And so, we didn't want to, kind of, confirm that to [Child] that dad was bad. We wanted to continue to work on that relationship and see if we could repair that relationship.

Tr. pp. 29–30.

[6] In June 2017, Father voluntarily stopped his visits with Child in an attempt to see if stopping visits with Child would "have a beneficial effect" on their relationship. Tr. p. 31. At this point, fifteen months had passed since Child was removed from her parents' care and adjudicated a CHINS.

[7] A year passed before Child's next review hearing, in August 2017. FCM Crippen reported that both parents had made progress in that time: Father was working, had resumed visits with Child, and had returned clean drug screens. Mother, too, was working, participated in therapy with Child, and had returned clean drug screens. Parents had moved into a new house in Knox. Both had been sentenced to the Starke County Community Corrections home detention program: Mother to day reporting, and Father to electronic monitoring home detention. In FCM Crippen's opinion, both parents had made positive progress in their criminal cases and in Child's CHINS case.

[8] Child, however, maintained her opposition to going back to live with her parents. FCM Crippen explored other placement options, but the decision was made to continue Child's placement with great-grandmother despite there being concerns about it being an appropriate long-term placement, due to great-grandmother's advanced age and Child's young age. FCM Crippen was also receiving conflicting reports about Child's relationships with parents: therapist Pamela McElroy ("McElroy") reported her concern that Child "was experiencing trauma from contact with mom and dad." Tr. pp. 38–39. Those who observed supervised visits between Child and parents, however, reported the visits were "fine" and that Child was bonding with Father. Tr. p. 39. FCM Crippen later testified that during this time, in late 2017, Child "seemed to be kind of stuck in that pattern of not wanting to go with dad but we had to try it, we couldn't hold it against the parents because [Child] was mad at them." Tr. p. 40. Accordingly, Father's visits with Child were increased, and the permanency plan was revised to solely recommend reunification. At the same time, to clarify the conflicting reports received, the trial court ordered DCS to "explore a new family therapist to work on the father-child relationship." Tr. p. 40.

[9] In January 2018, FCM Crippen and the child and family team determined that the family was ready to participate in partially supervised visits, a step closer to reunification. The next review hearing occurred on April 10, 2018, at which point the report from the court-ordered family therapist was presented. FCM Crippen explained of the family therapist's court-ordered report:

> [S]he provided a report but it wasn't complete. She had talked
> about a parenting assessment but hadn't completed it with both
> parents. She was supposed to observe the parents in the home
> with [Child,] but didn't observe them more than just for about 45
> minutes all together. She got a lot of information from the child,
> and [court-appointed special advocate ("CASA")], and grandma,
> and hadn't talked to the visit providers; hadn't talked to DCS. . .
> So, we have a lot of concerns about this report.

Tr. pp. 42–43.

[10] Even after DCS requested the report be redone, FCM Crippen stated that it was never completed satisfactorily: "it wasn't enough information." Tr. p. 43. Furthermore, the family therapist had provided DCS with recommendations for the parents but had recommended to CASA termination of parental rights. The court determined that Child's visits with both parents should stop. It also issued a no-contact order between Child and an individual who had been living with parents. Child was to start trauma-focused cognitive behavioral therapy ("TF-CBT"). And Child received a new placement after over two years living with her great-grandmother, based on the belief that a "neutral setting" was needed.

[11] On May 13, 2018, Child moved in with a kinship foster family. Also in May 2018, Father was found to have violated home detention after returning positive screens for alcohol and was incarcerated. Child's next review hearing took place in July 2018. FCM Crippen reported the family's status at that point:

> We actually were [] working on trying to reunify [Child] with
> mom. Dad is incarcerated; he will be incarcerated for several
> years. [Child] would have several years to bond with mom,

before dad is released; so, [a] lot can happen in a few years. . . . The therapist had recommended to bring mom in to work with [Child] to tell her story; talk about the trauma with mom.

Tr. p. 50.

[12] FCM Crippen went on to say that, in July 2018, Mother had been discharged from probation, and her criminal case was closed. Child's permanency plan was, again, reunification with a concurrent plan of adoption.

[13] This plan was short-lived: a third permanency hearing occurred in late 2018, at which time the sole permanency plan was adoption. By this time, Child had been outside the care of her parents for nearly three years. As FCM Crippen explained:

> Dad was still incarcerated. Mom had lost her job, and had not been honest about it. . . She had lost her housing. . . There were some concerns for her physical health that she was not taking care of. [DCS recommended] [p]arenting education with a focus on empathy and power. A psychological assessment, because there were concerns during that assessment expressed that [Mother] may have some depression. Individual therapy, and a bonding assessment for [Child] and mom.

Tr. pp. 53–54.

[14] Mother, however, refused psychological and individual therapy. She refused to participate in random drug screens. Mother also failed to regularly attend the TF-CBT sessions with Child. She did not attend the third permanency hearing. DCS did not receive information as to what caused the decline in participation

in services, and FCM Crippen testified that because parents were in the same situation as they had been three years previously, she did not believe the reasons that led to Child's removal had been remedied. Thus, DCS filed a petition to terminate parental rights on November 18, 2018. The trial court held a fact-finding hearing on the petition in April 2019, and issued an order granting the petition to terminate Mother's and Father's rights to Child on May 7, 2019. This appeal followed.

## Discussion & Decision

[15]     Parental rights are "precious and protected by our Federal and State constitutions." *In re Adoption of C.B.M.*, 992 N.E.2d 687, 692 (Ind. 2013). Accordingly, when seeking to terminate parental rights, DCS must prove its case by clear and convincing evidence, a heightened burden of proof that reflects the "serious social consequences" of parental rights termination. *In re G.Y.*, 904 N.E.2d 1257, n.1 (Ind. 2009). Decisions to terminate parental rights are among the most fact-sensitive that trial courts are called upon to make. *In re E.M.*, 4 N.E.3d 636, 639 (Ind. 2014). We review such decisions with great deference in recognition of a trial court's unique position to assess the evidence. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). Our standard of review in TPR cases requires us to consider only the evidence favorable to the judgment below; we do not reweigh the evidence nor judge the credibility of witnesses. *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). Rather, we ask whether the evidence clearly and convincingly supports the trial court's findings, and then whether the findings clearly and

convincingly support the judgment. *K.T.K. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 1225, 1229–30 (Ind. 2013).

[16] Thus, before a parent-child relationship may be terminated, DCS must prove by clear and convincing evidence:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2).

[17] Parents in this case challenge the sufficiency of the evidence to support terminating their parental rights, arguing that DCS failed to prove every necessary element of its case by clear and convincing evidence. Appellant's Br. at 13. DCS was required to prove four elements under the statutory scheme, *supra*; here, the trial court found that DCS exceeded its burden and proved six elements by clear and convincing evidence. The trial court's findings are: (1) Child had been removed from parents for at least six months under a dispositional decree; (2) Child had been removed from parents and had been under the supervision of a local office for at least fifteen months of the most recent twenty-two months, beginning with the date Child was removed from the home as a result of Child being alleged to be a CHINS; (3) there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home of the parents will not be remedied; (4) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child; (5) that termination is in

the best interests of Child; and (6) that there is a satisfactory pan for the care and treatment of Child. *See* I.C. § 31-35-2-4(b)(2).

[18] Parents do not challenge the trial court's findings that we have numbered (1) and (2). It is undisputed that a dispositional decree resulted in Child being removed from parents for at least six months; in fact, at the time of the TPR hearing, Child had been outside parents' custody for forty consecutive months since December 15, 2015, when she was removed as a result of the CHINS petition. Whether DCS proved at least one element under Indiana Code section 31-35-2-4(b)(2)(A) is therefore answered in the affirmative. Accordingly, we turn to the remaining four elements that parents challenge, under subsections (B), (C), and (D), and assess whether the trial court erred in determining that those elements were proven by clear and convincing evidence.

## I.   Conditions Remedied

[19] Parents argue that DCS failed to prove that there was a reasonable probability the conditions resulting in Child's removal would not be remedied. Appellant's Br. at 14; I.C. § 31-35-2-4(b)(2)(B)(i). Following the event—the meth lab explosion—that prompted DCS's involvement in her case, Child was removed from parents' care due to their incarceration and their drug use. Appellant's App. p. 71. Parents were subsequently charged, convicted, and served (in Mother's case) or are still serving (in Father's case) their respective sentences associated with their convictions following the explosion. On May 17, 2018, notice of community corrections violation was filed in Father's case because he had tested positive for alcohol on July 25, 2017, October 2, 2017, and May 2,

2018. *Id.* at 72–73. Father also provided diluted samples on July 31, 2017, and March 14, 2018. Father's violation resulted in his resentencing to purposeful incarceration, where he remained at the time of the TPR fact-finding hearing. His earliest release date is early 2021. Because Father remained incarcerated at the time of the fact-finding hearing in 2019 and his incarceration was one of the conditions that resulted in Child's removal in 2015, the trial court did not err in finding that DCS established a reasonable possibility that that particular condition resulting in Child's removal, as it relates to Father, would not be remedied.

[20] By July 2018, Mother had successfully completed all terms and conditions of her probation. Appellant's App. p. 76. Mother, however, was arrested two months prior to the TPR fact-finding hearing. On February 25, 2019, Mother was arrested after being apprehended in a home where there was also methamphetamine, items to manufacture the drug, and paraphernalia present. Mother had not been charged at the time of the hearing, though law enforcement referred a charge of visiting a common nuisance to the Starke County Prosecutor. Because Mother was arrested in connection with drug usage in 2019 and because she refused drug screens several times during the CHINS case, and drug use was one of the conditions that resulted in Child's removal in 2015, the trial court did not err in finding that DCS established a reasonable possibility that that particular condition, as it relates to Mother, would not be remedied.

Thus, based on the record viewed in the light most favorable to the judgment below, we are satisfied that clear and convincing evidence supports the trial court's findings, and these findings in turn support its conclusion that there is a reasonable probability that the reasons for Child's placement outside the home will not be remedied.

## II. Threats to Child's well-being

Parents also argue that, under Indiana Code section 31-35-2-4(b)(2)(B), DCS failed to prove that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. Appellant's Br. at 19. The trial court's order granting the petition for TPR included careful discussion of evidence of the trauma Child experienced before she was removed from her parents' care, and the effects of that trauma still visible in the parent-child relationship after Child's removal. Appellant's App. pp. 78–80. In the aftermath of the explosion in the apartment, Child was observed to be panicked and anxious, startling from sleep and requiring medical evaluation after exposure to the explosion. In the years after Child's removal, several therapists assisted Child in addressing other symptoms of trauma, including stomach aches, teeth grinding, and anxiety anticipating visits with Father. Appellant's App. p. 78. When relaxation techniques and self-expression help were insufficient to support Child in addressing symptoms of trauma, the trial court ordered she participate in specialized, trauma-focused therapy. Mother did not attempt to participate in this therapy and has not visited nor contacted Child since August 2018. Since starting TF-CBT and moving in with

a foster family unconnected to her biological parents, Child has been observed to make significant progress in addressing her trauma symptoms.

[23] We note that the evidence presented indicates how, over the years, various therapists and family counselors have differed in their reports about the health of the parent-child relationship. The standard that DCS's case must meet, however, is demonstration of a *reasonable probability* that the Child will be threatened by the continuation of her relationship with parents. *See* § 31-35-2-4(b)(2)(B)(ii). Parents argue that the trial court erred in concluding that continuation of the parent-child relationship threatens Child's well-being because there have been positive reports of family therapy sessions and times when Child was amenable to visits with Mother and Father. This argument, however, is a request to reweigh the evidence presented, which we decline to do on appeal. *See In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Considering how the trial court heard evidence regarding the possibility of parents' continued drug use and incarceration, and heard evidence of Child's trauma caused by her parents' incarceration following their decision to manufacture methamphetamine in the family's home, the trial court did not err in finding that DCS established a reasonable possibility that continuation of the parent-child relationship posed a threat to Child's well-being. Appellant's App. p. 71.

### III. Best Interests

[24] Indiana Code section 31-35-2-4(b)(2) requires DCS to prove by clear and convincing evidence both that termination is in the best interests of the child

and that there is a satisfactory plan for the care and treatment of the child. Parents dispute that DCS has proved the former. Appellant's Br. at 20. When a trial court examines the best interests of a child in a TPR case, it is required to look beyond the factors identified by DCS to the totality of the evidence presented. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* Where recommendations are made by a child's family case manager and a CASA that termination of parental rights is warranted—in addition to evidence that the conditions resulting in removal will not be remedied—is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000), *abrogated on other grounds by In re G.P.*, 4 N.E.3d 1158 (Ind. 2014).

[25] The totality of the circumstances in this case reveals mixed success in attempts by parents to act in the best interests of their Child. At the outset of the CHINS case, Mother and Father were incarcerated but admitted, in part, the allegations in the petition alleging Child was a CHINS. Both parents agreed with DCS recommendations for services and attempted to comply with the trial court's dispositional orders. For example, Mother and Father completed substance abuse assessments and cooperated with service providers. Father secured and maintained a legal and stable source of income; Mother's housing was safe and stable. In recognition of these efforts at compliance, DCS repeatedly recommended reunification as Child's permanency plan, with adoption as the secondary option. At one point, adoption was removed from the permanency

plan because DCS believed Child's relationship with parents was developing in a positive direction.

[26] Parents' compliance with trial court orders and DCS recommendations, however, was inconsistent and eventually reached a point where DCS no longer believed reunification with either parent was viable. Housing and sources of income secured were lost. Mother became unwilling to participate in individual and family therapy and eventually stopped. Mother also refused to submit to random drug screens, and Father returned positive screens on several occasions. Most recently, Father violated the conditions of his probation and was incarcerated, where he remained at the time of the TPR hearing, and Mother was arrested at a residence in the presence of materials used to manufacture methamphetamine. Given a substantial period of time—forty months at the time of the TPR hearing—parents were unable to demonstrate compliance with DCS recommendations that indicated reunification was in the best interests of Child. At the TPR hearing, FCM Crippen explained the significance of the amount of time that had passed since Child was adjudicated a CHINS:

> Q: Are there any other services that could have been offered for this family?
>
> A: I don't believe so. I mean, we tried reunification over and over again. We tried multiple therapies; multiple therapists. We had actually filed a TPR petition and dismissed it because the parents were doing well.

* * *

Q: [Y]ou advocated fairly strongly for a reunification for a long time. And why is it that you believe it's in the [Child's] best interest for termination and adoption?

A: At this point, parents aren't at a different spot than they were three and a half—almost three and a half years ago. . . . And, [Child] can't wait any longer. It became a point where [Child] has been in the system for so long, she [is] at risk of feeling institutionalized. She doesn't have permanency, and she needs that at this point.

Tr. pp. 57, 72–73.

[27] Furthermore, Child's CASA, John Wampler ("Wampler"), advocated for termination of Mother's and Father's rights to Child, and specifically explained why, in his view, continuation of the parent-child relationship would be against Child's best interests. In his written report submitted to the trial court, Wampler emphasized the "deep emotional scars" Child sustained from living with Mother and Father, as evidenced by symptoms like stomach aches, irregular sleep, and teeth grinding, for which there was no physical cause. Appellant's App. p. 56. Wampler acknowledged parents' participation in family therapy but concluded that those visits with Child did nothing to alleviate Child's symptoms: "the only thing that alleviated [Child]'s trauma symptoms has been her time away from any relatives and in the home of her kinship placement." Appellant's App. p. 57. Wampler's recommendation was also informed by Child's own feelings about her placement: in the years since she was removed from her parents' care, Child maintained that she did not want to live with or be cared for by Father. Child, now age eight, wants to make her current kinship

placement permanent and is "truly happy" in her pre-adoptive family. Appellant's App. p. 58. In its consideration of Child's best interests, the trial court also noted her progress in specialized, trauma-focused therapy and the positive effect it was having in her life. Appellant's App. p. 80.

[28] Finally, the trial court found that DCS presented a satisfactory permanency plan, with adoption providing "a safe, stable, loving and permanent home environment free from criminal activity and illegal substances. The Child has bonded with the [pre-adoptive] family and desires to be a member of their family." Appellant's App. p. 81.

[29] Based on the totality of the evidence, including the agreement between DCS and CASA about what is in Child's best interests, we conclude that there is sufficient evidence to support the trial court's findings and ultimate determination that termination of Father's and Mother's parental rights is in Child's best interests. *See, e.g., In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of CASA and family case manager, plus evidence that conditions resulting in continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence that termination is in child's best interests), *trans. denied*; *see also McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003) (concluding that CASA testimony regarding child's need for permanency supports a finding that termination of parent-child relationship is in child's best interests).

# Conclusion

For all of these reasons, we conclude there is sufficient clear and convincing evidence to support the trial court's order to terminate Mother's and Father's rights to Child.

Affirmed.

Robb, J., and Pyle, J., concur.